IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

CHARLES GARY LIPSCOMB II,

     Plaintiff,

v.                             CASE NO. 2:10-cv-00326

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Charles Gary Lipscomb II (hereinafter referred to as "Claimant"), filed an application for DIB on August 8, 2006, alleging disability as of September 1, 2001, due to back injury (affecting legs, arms, hips, neck), high blood pressure, depression, and chest pain.  (Tr. at 11, 114-18, 147-55, 156-62, 163-68.)  The claim was denied initially and upon reconsideration. (Tr. at 50-54, 57-59.)  On April 25, 2007, Claimant requested a

hearing before an Administrative Law Judge ("ALJ").  (Tr. at 60.)
The initial hearing was held on January 24, 2008, and a
supplemental hearing was held on December 15, 2008, before the
Honorable Jon K. Johnson. (Tr. at 18-32, 33-47, 71-74, 85-88.)  By
decision dated February 10, 2009, the ALJ determined that Claimant
was not entitled to benefits.  (Tr. at 11-17.)  The ALJ's decision
became the final decision of the Commissioner on January 14, 2010,
when the Appeals Council denied Claimant's request for review.
(Tr. at 1-3.)  On March 13, 2010, Claimant brought the present
action seeking judicial review of the administrative decision
pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the
burden of proving a disability.  See Blalock v. Richardson, 483
F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the
"inability to engage in any substantial gainful activity by reason
of any medically determinable impairment which can be expected to
last for a continuous period of not less than 12 months . . . ."
42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential
evaluation" for the adjudication of disability claims.  20 C.F.R.
§ 404.1520 (2002).  If an individual is found "not disabled" at any
step, further inquiry is unnecessary.  Id. § 404.1520(a).  The
first inquiry under the sequence is whether a claimant is currently
engaged in substantial gainful employment.  Id. § 404.1520(b).  If

2

the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in

substantial gainful activity since the alleged onset date.  (Tr. at 13.)  Under the second inquiry, the ALJ found that Claimant did not suffer from a severe impairment and was not disabled as of his date last insured of September 30, 2003.  (Tr. at 13-16.)  Therefore, the ALJ did not proceed to the third, fourth, or  final inquiry.  Id.  On this basis, benefits were denied.  (Tr. at 17.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

<u>Claimant's Background and Employment</u>

Claimant was 37 years old at the time of the administrative hearings, which took place five years after his date last insured. (Tr. at 37.)  He has a high school education, a pipefitter's apprenticeship, a five-year certification in pipefitting from a community college, and Occupational Safety and Health Administration ["OSHA"] training.  (Tr. at 39, 304.)  In the past, he worked as a pipefitter, a transportation manager, and a self-employed independent construction contractor.  (Tr. at 41-42.)

The ALJ found that Claimant worked from October through December of 2004, but characterized it as an unsuccessful work attempt.  (Tr. at 13.)  Claimant also worked for three months in 2002, September of 2004, and January through March of 2005, which the ALJ found not to be substantial gainful activity.  <u>Id</u>.

The undersigned notes that there are additional references to Claimant's employment in the medical record.  For example, on August 1, 2005, Dr. Saldanha noted that Claimant is "going back to work today."  (Tr. at 293.)  On May 2, 2006, Dr. Saldanha wrote that medications "have allowed him to continue working without much trouble."  (Tr. at 286.)

Claimant's earnings record indicates that he was paid for working in 2004 and 2005, but not in 2006.  (Tr. at 120-32.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence As of Date Last Insured

On January 21, 2000, Claimant was treated at Kanawha City Urgent Care for his complaints of "sinus drainage/congestion/right ear X [times] 2 days, cough....Diagnosis: Bronchitis." (Tr. at 197.) Robert Smith, M.D. performed a chest exam and x-ray and found: "PA and lateral chest demonstrate the cardiac silhouette to be normal in size and contour. Lung fields and costophrenic angles are clear. IMPRESSION: NO ACUTE PULMONARY INFILTRATES." (Tr. at 198.)

On February 20, 2000, Claimant was treated at Kanawha City Urgent Care for his complaints of "bloody sinus drainage, right ear plugged up, right eye watering X 3-4 days; 'neck hurts' X one month...Diagnosis: 1) URI [Upper Respiratory Infection], 2) Bronchitis, 3) Cervical/Trapezium sprain." (Tr. at 196.)

On December 28, 2000, Claimant was treated at Kanawha City Urgent Care for his complaints of "stomach pain." (Tr. at 192.) On that same date, he underwent several blood tests and was referred to Charleston Area Medical Center ["CAMC"] where he was diagnosed with a hiatal hernia. (Tr. at 182-4, 193-95.) Steven R. Matulis, M.D. stated: "Retroflexion revealed a hiatal hernia, no other pathology in the proximal stomach...I will give him a full

6

two month course of Prevacid since he has had improvement in the last two weeks on this medication." (Tr. at 184.)

On May 2, 2001, Claimant had a recheck regarding his abdominal pain of December 18, 2000 at Kanawha City Urgent Care and was noted to be "Better".  (Tr. at 191.)   The diagnosis is stated as "Polycythemia [high red blood cell count]. Refer to Hematologist." Id.

On May 24, 2001, June 14, 2001 and June 22, 2001, Claimant underwent blood testing which showed normal red cell volume and a left upper quadrant ultrasound at CAMC. (Tr. at 180-81, 189-90, 274-78.)   Justin Cohen, M.D. stated: "Clinical history: Polycythemia...IMPRESSION: Ultrasound of the spleen is within normal limits." (Tr. at 190, 277-78.)

On June 28, 2001, Dr. Cohen stated in a report titled Hematology/Oncology Clinic Telephone Contact:

> I had a long discussion with Mr. Lipscomb regarding his recently normal red blood cell mass, a normal ultrasound of the spleen as part of an evaluation of elevated hematocrit.  He does not appear to have true erythrocytosis. We discussed the potential etiologies of this.  He is essentially asymtomatic as well.  Plan at present is to have a CBC checked every two months and we will see him back in clinic in six months, but more importantly he was carefully instructed to notify me immediately if he had any change in symptoms or questions whatsoever at any time prior to his next visit.

(Tr. at 273.)

On March 3, 2002, Claimant went to Kanawha City Urgent Care, also known as Health Plus Family Care Center, with complaints of

7

"low back pain - tractor rolled at home - "several weeks ago" - fell ice skating." (Tr. at 188.) This is the first reference to this tractor accident in the record. Christopher A. Schlarb, M.D. stated in an x-ray report: "Five views of the lumbar spine were obtained and reveal the alignment of the bones to be unremarkable. I see no fractures or dislocations. The alignment of the bones is unremarkable. IMPRESSION: NO ACUTE ABNORMALITIES." (Tr. at 187.)

Physical Evidence After Date Last Insured

On December 8, 2003, Claimant was treated at Kanawha City Urgent Care for a "cough, runny nose and body ache." (Tr. at 185.) Tests for the virus strains RSV, Adenovirus, Influenza A, Influenza B, Parainfluenza 1, Parainfluenza 2, and Parainfluenza 3 were negative. (Tr. at 186.)

Records indicate Jeffrey Hively, M. D., Spring Hill Primary Care Physicians, treated Claimant on eight occasions from March 18, 2004 to April 6, 2006 for low back pain, hypertension, high cholesterol and GERD. (Tr. at 207-38.) Records indicate that on those eight occasions, Claimant was prescribed Flexeril 5 mg, Prevacid 30 mg, Aciphex 20 mg, Benicar 20 mg, Benicar 40 mg, Lipitor 20 mg, Zocar 20 mg, Nexium 40 mg, Ibuprofen 300 mg, Lortab 5 mg, Lortab 10 mg, Lexapro 10 mg, Effexor XR 150 mg, Lipitor 20 mg, Omeprazole 20 mg, Zoloft 50 mg, Klonopin, and Kadian. (Tr. at 219-21.) The March 18, 2004 initial intake form, signed by Michele Roach, PA-C [physician's assistant - certified] states that

Claimant "here to be established.  Pt [patient] c/o [complains of] LBP [low back pain] x [times] 2-3 yrs [years] [due to] being run over by tractor. Radiates to L [left] arm + [plus] numbness in L hand.  Takes Flexeril - helps....6 pack/qod [every other day]." (Tr. at 217-18.)

On March 31, 2004, Dr. Hively ordered a lumbar and cervical spine x-rays due to Claimant's complaints of neck and back pain. (Tr. at 235-36, 297.)   John A. Willis, M.D. reported:

LUMBAR FIVE VIEWS:

There are minimal osteophytes at the L4 level.  There is no evidence of compression fracture, malalignment, or destructive lesion.  Disc spaces are well preserved.

IMPRESSION:
Minimal degenerative changes...

C SPINE SIX VIEWS:

HISTORY: Neck pain.  MVA [motor vehicle accident] two years ago.  There is reversal of the normal lordosis. There is no focal malalignment.

IMPRESSION:
No acute osseus injury demonstrated.  Reversal of the normal cervical curvature without focal malalignment.

(Tr. at 235-36.)

On April 26, 2004, Dr. Hively ordered a "Spine MRI without contrast" due to Claimant's complaints of "low back pain."  (Tr. at 233, 296.)   Frank A. Muto, M.D. reported on April 27, 2004:

COMPARISON: Radiographs dated 3/31/04.

TECHNIQUE: Multiplanar, multisequence imaging of the lumbar spine was performed without gadolinium.

> FINDINGS: Overall demonstrates normal alignment and marrow signal for age. The canal is not congenitally narrowed. There is no evidence of disc material beyond its normal confines or exit canal stenosis.
>
> IMPRESSION: No evidence of disc herniation or exit foramen narrowing.

(Tr. at 233, 296.)

On April 26, 2004, Dr. Hively also ordered a "MRI left shoulder without contrast" due to Claimant's complaints of "left shoulder pain." (Tr. at 234.) Frank A. Muto, M.D. reported on April 27, 2004:

> COMPARISON: None.
>
> TECHNIQUE: Multiplanar and multisequence imaging of the left shoulder was performed without contrast.
>
> FINDINGS: Overview demonstrates normal bone marrow signal throughout. The acromiohumeral space is preserved. There are no significant acromioclavicular hypertrophic changes. The rotator cuff shows no evidence of tear. There is minimal increased T2 signal within the bursal side 1 cm proximal to its attachment on the grater tubercle. This may represent mild tendonopathy. The muscles of the rotator cuff are not atrophied. The biceps tendon is in its expected relationship. The glenoid labrum is without evidence of an acute abnormality.
>
> IMPRESSION: No evidence of rotator cuff tear or acute internal derangement of the left shoulder.

(Tr. at 234.)

On March 1, 2005, Claimant signed a "Chronic Narcotic Medication Contract" with Spring Hill Primary Care Physicians. (Tr. at 213, 218, 222.)

Although the handwritten notes from Spring Hill Primary Care

are largely illegible, a noted dated January 17, 2006 states in part "back pain...unable to work." (Tr. at 208.)  A note dated April 6, 2006 states in part "back pain, chronic...injections Saldanha." (Tr. at 207.)

Records dated July 28, 2005 to August 30, 2007 indicate Claimant was treated by Francis M. Saldanha, M.D., Charleston Pain Management Consultants, on fifteen occasions. (Tr. at 280-95.) At the initial evaluation, Dr. Saldanha stated:

> History of Present Illness: Charles Lipscomb is 35 years old.  He presented with a very chronic history of neck and back pain.  He has been in multiple accidents including automobile accidents, motorbike accidents and approximately two to three years ago he was involved in an ATV [all terrain vehicle] accident which he feels really did him in...He is a fairly active individual.  He has had a workup which has ruled out any disc herniation in the neck or back.  He has had chiropractic treatment, but unfortunately without significant long term relief.  His lumbar MRI was negative.  He does not describe incontinence of bladder or bowel.  He does not describe symptoms suggestive of an ongoing lumbosacral radiculopathy or cervical radiculopathy...

> Examination: He is friendly and cooperative.  He ambulates without much difficulty.  He has a fairly normal range of motion of the low back.  He has significant tenderness involving the lumbar facet and sacroiliac joints, more on the left side.  The SLR is negative for sciatica or back pain in the seated position.  There is no acute motor or sensory deficit.  His reflexes are intact.  The upper extremities are normal to exam.  The cervical spine exam demonstrated a couple of trigger points involving the paraspinous cervical musculature, but this is not as significant as the low back findings.  Cranial nerves III-XII are grossly intact.  He ambulates without difficulty.

> Diagnosis: Cervical and lumbar strain.  Degenerative disc disease, lumbar facet arthropathy. (847.0) (847.2) (724.8)(722.52)

11

Treatment Plan: I have had a lengthy discussion with him
and I explained to him that there might not be a whole
lot that I can do.  However, I am willing to try an
injection of the facet joints and I hope this gives him
some relief.  He does appear to be a very active
individual and he has been advised to get his high blood
pressure checked and to be checked for diabetes as well.
Otherwise, he understands that this is just a trial
injection and we just have to evaluate his progress after
the treatment.  He has been scheduled to return in the
near future for his lumbar facet injection.  No
injections are recommended in the neck at this time.
cc:  Dr. Jeff Hively

(Tr. at 294-95.)

On August 1, 2005, Dr. Saldanha stated in a treatment note:
"Mr. Lipscomb came by today for his first injection...He was
discharged in good condition...He is going back to work today and
I will bring him back for trigger points in a couple of weeks."
(Tr. at 293.)

On August 15, 2005, Dr. Saldanha stated in a transcription
note: "Mr. Lipscomb is not quite sure of the results from the facet
joint injections...He came by today for trigger point
injections...He has started to use a Tens unit.  If he feels that
the trigger point injections have helped we will repeat in two
weeks."  (Tr. at 292.)

On August 30, 2005, Dr. Saldanha stated: "Mr. Lipscomb has
finally started to improve and he states that there is no question
he is doing better.  I am quite optimistic that we will make fairly
good progress...another session of trigger point injections in four
weeks."  (Tr. at 291.)

12

On December 5, 2005, Dr. Saldanha noted: "Mr. Lipscomb continues to do well with an occasional treatment.  He had lumbar facet joint injections today.  Tentatively in two months we will perform trigger point injections."  (Tr. at 290.)

On January 31, 2006, Dr. Saldanha stated in an office visit report:

> Follow up:  Mr. Lipscomb now feels that we may not be quite providing the relief we did in the past.  The last session of facet injections did not quite do the trick. He continues to have significant pain across the back and now complains of pain going across his legs.  I have extensively reviewed his initial evaluation and whatever records I had.  The MRI was negative.  ROS, PFMSH, etc. remain unchanged from prior visits.  He continues to work full time.  He has no incontinence of bladder or bowel...
>
> Examination:  He is friendly and cooperative.  He ambulates without difficulty.  There is a restricted range of motion of the back and there is facet tenderness worse on the left side.  SLR is negative.  Reflexes are intact.  There is no motor or sensory deficit... Treatment Plan: I have had a lengthy discussion with him regarding various alternatives.  I have finally decided to place him on Klonopin 1 mg at night and I have asked him to check with Dr. Hively to make sure there is no interaction with the other medications he is receiving. The option is to offer him an epidural as well.  However I will reassess his progress in two months before I make a decision.

(Tr. at 289.)

On March 10, 2006, Dr. Saldanha reported:

> He reports that the Klonopin did help him a bit and he is sleeping somewhat better.  I recommend that we continue with the medication.  I have reviewed his medical records and appears today that we probably still need to perform an epidural injection.  However, due to his severe pain I feel it is time to add Kadian to his medication profile...one daily, 30 mg each.  I tentatively have scheduled him for an epidural in one month.

13

(Tr. at 288.)

On April 5, 2006, Dr. Saldanha wrote in a treatment note:

> Mr. Lipscomb feels that the Kadian has helped without any
> question.  This is very good news.  However, I believe it
> is time to increase it somewhat and I have raised it to
> 50 mg one daily and we use Lortab for supplemental pain
> relief.  We performed an epidural injection today.  This
> is his first epidural.   If this treatment plan works
> finally it would be something that we have found that
> helps him.

(Tr. at 287.)

On May 2, 2006, Dr. Saldanha reported: "The medications are

helping significantly and they have allowed him to continue working

without much trouble...I have refilled his medications.  If he does

have a flair up I will repeat the epidural, but not at this time."

(Tr. at 286.)

On July 6, 2006, Dr. Saldanha stated that Claimant had

returned for a follow up "with c/o [complaints of] continued severe

back pain and diffuse neck and arm aching.  The use of Kadian with

Lortab helps to some extent.  However he states he is unable to

work...I have refilled his medications.  I have prescribed PT

[physical therapy] for 6 weeks."  (Tr. at 285.)

On August 10, 2006, Dr. Hively ordered a "Myocard Perf Multi

Spect NM" due to Claimant's complaints of "chest pain."  (Tr. at

237.)  On that same date, Steven A. Artz, M.D. reported:

> Treadmill stress test performed for 4 minutes and 47
> seconds.  The patient achieved a maximum rate of 162.
> Blood pressure at maximum exercise was 157/78.  Images
> were acquired using the rest/stress protocol...

14

Gated SPECT images show normal thickening and contraction of the myocardium. No areas of paradoxical motion are noted. The ejection fraction is 64%.

IMPRESSION: Negative scan for ischemia.

(Tr. at 237-38.)

On October 3, 2006, Dr. Saldanha stated: "His medications have been refilled and he appears to be using them in a well-disciplined manner and at this point there are no plans to change medication doses or frequency." (Tr. at 284.)

On December 28, 2006, a State agency medical source did not complete a Physical Residual Functional Capacity Assessment. (Tr. at 239-46.) The evaluator, Uma Reddy, M.D., opined that there was "[i]nsufficient medical evidence to evaluate this claim." (Tr. at 246.)

On January 16, 2007, Dr. Saldanha stated: "I have refilled his medications but with an increase in the Kadian to 60 mg. He may yet consider another injection of the facet joints." (Tr. at 283.)

On February 21, 2007, Spring Hill Primary Care Physicians returned a request for medical records form stating "No records for dates requested 1-2000 to 9/2000." (Tr. at 247.) However, Spring Hill Primary Care Physicians did supply records dated April 19, 2004 to April 17, 2007. (Tr. at 314-25.) Although the handwritten notes are largely illegible, what is legible demonstrates twelve office visits for check-ups, follow-ups, and medication management for hypertension and pain. Id.

15

On February 28, 2007, Charleston Pain Management Consultants returned a request for medical records form stating "No records available for the dates requested [1/2000 - 9/30/2003]. Initial visit for pt [patient] was 7/05." (Tr. at 248-49.)

On March 14, 2007, a State agency medical source did not complete a Physical Residual Functional Capacity Assessment. (Tr. at 264-71.) The evaluator, Marcel Lambrechts, M.D. opined that there was "[i]nsufficient medical evidence to assess." (Tr. at 271.)

On March 30, 2007, Jeff Hurley, M.D. completed a form titled "Medical Assessment of Ability to do Work-related Activities." (Tr. at 311-13.) He marked "yes" that Claimant's "Lifting/Carrying affected by impairment...[due to] low back pain, elbow pain...Standing/Walking affected by impairment...Sitting affected by impairment." (Tr. at 311.) He opined that Claimant could lift/carry a maximum weight of ten pounds occasionally and less than five pounds frequently; could stand/walk less than 2 hours in an 8-hour work day and without interruption for less than five minutes; and sit less than four hours in an 8-hour work day and without interruption for less than fifteen minutes. Id. He opined that Claimant could never perform any of the postural activities. (Tr. at 312.) He also marked that Claimant's environmental restrictions were "heights, temperature extremes, noise, humidity and vibrations." Id. He marked that Claimant had manipulative

limitations in reaching all directions, handling, and fingering.
Id. He marked that Claimant had no visual or communicative
limitations. (Tr. at 313.) In handwritten notations, Dr. Hurley
wrote: "Again, pain, weakness all made worse with any
activity...Driving is affected; limited housework & daily
activities...Also I think his disability was present prior to
September 2003." Id.

On April 17, 2007, Dr. Saldanha stated in a follow-up report:

> I have increased the Kadian to 100 mg and he will
> continue on the Lortab as well. He understands very
> clearly the potential risks of chronic narcotic use as
> well as the risk from using NSAID present in the Lortab.
> He has been cautioned about the use of alcohol as well
> and he admits to using an occasional beer. No injections
> are recommended at this time.

(Tr. at 282.)

On August 16, 2007, Dr. Saldanha reported that Claimant had
returned for a follow up visit:

> He continues to have significant back pain...Pain is
> across the back and quite disabling. He has been unable
> to return to gainful employment. The use of Kadian and
> Lortab has definitely helped...His previous workup,
> including an MRI was essentially negative for disc
> herniation. I have examined various alternatives with
> him. I will continue prescribing medications, but he is
> willing to attempt bilateral median nerve branch blocks
> and will take things from there.

(Tr. at 281.)

On August 30, 2007, Dr. Saldanha stated that Claimant had
returned for his median nerve branch block:

> This was performed on the left side with no
> problem...unfortunately in the past treatments have not

17

> helped and we had stepped away from any injectable
> modalities for nearly two years. He would like to resume
> perhaps something that might help him and the best I
> could offer was median nerve branch block with the hopes
> that if it helped, we could consider radiofrequency
> lesioning.  We will check with him tomorrow and he has
> been asked to keep a time table of his pain over the next
> 24 hours.

(Tr. at 280.)

An undated Social Security Administration form indicates Claimant's daily medications prescribed by Dr. Hively are Lortab, Lyrica, Flexeril, all for "pain" Benicar for "blood pressure", Bytorin for "cholesterol", Zoloft for "depression", and Prilosec for "GERD".  (Tr. at 178.) Claimant also takes the medication Kadian for "pain" on a daily basis, which is prescribed by an unnamed physician.  Id.

On January 24, 2008, Claimant testified that the doctor prescribing Kadian, a morphine, was Dr. Saldanha with Charleston Pain Management.  (Tr. at 43.) He further testified that he smoked tobacco and marijuana every day and drank a six-pack every other day.  (Tr. at 40-41.)

On April 17, 2008, a State agency medical source reported a Consultative Examination of Claimant.  (Tr. at 326-31.)  The examiner, Kip Beard, M.D. reached these conclusions:

> IMPRESSIONS:
> 1.  Chronic cervical, thoracic and lumbosacral strain.
> 2.  Hypertension.
> 3.  Chest pain, atypical for angina.
>
> SUMMARY: The claimant is a 37-year-old male involved in
> a tractor accident in 2001.  He describes the tractor

18

rolling and bouncing off of him.  He reports no diagnosis of fractures related to this.  He presented two weeks later to seek treatment and has undergone rather extensive treatment since then, including pain clinic treatment with injections and physical rehabilitation. He has had no significant improvement.  He complains of constant pain from the neck to the low back.  His low back area is the worst area of pain.  Medical records included some office notes with reference made to neck and back pain. I did not see any reference made to either x-rays or MRIs of the back within the provided records. The examination today reveals complaints of up to moderate discomfort on forward bending at the waist with some mild motion loss.  Straight leg raising produced no radicular pain.  Reflexes were symmetrical and there was no obvious neurologic compromise.  The neck examination revealed some mild discomfort with motion loss, again with symmetric reflexes and no evidence of myelopathy or radiculopathy.  The claimant's gait was uncomfortable, slow and somewhat stiff, but without limp.  He did not appear to require ambulatory aids.

In terms of hypertension, I did not appreciate any end-organ damage related to this.  The claimant does provide a history of chest pain, which is probably musculoskeletal in origin and is atypical for that related to angina.

(Tr. at 330.)

On April 17, 2008, Dr. Beard also completed a form titled "Medical Source Statement of Ability to do Work-Related Activities."  (Tr. at 332-38.)  Following his examination of Claimant, he concluded Claimant could continuously lift and carry up to ten pounds, frequently lift and carry 11 to 20 pounds, occasionally lift anc carry 21 to 50 pounds, and never lift and carry 51 to 100 pounds. (Tr. at 332.)  He noted that Claimant did not require the use of a cane to ambulate, could sit/stand/walk for one hour at one time without interruption; sit for a total of four

hours, stand for three hours, and walk for two hours in an eight hour work day. (Tr. at 333.) Regarding Claimant's use of his hands, Dr. Beard found Claimant could occasionally reach (overhead and all other) and push/pull, and frequently do handling, fingering, and feeling activities. (Tr. at 334.) Regarding the use of feet, Claimant was found to be able to occasionally do operation of foot controls. Id. Claimant was determined to be able to occasionally perform the postural activities of climbing stairs, ramps, ladders and scaffolds, stooping, kneeling, and crouching; to continuously be capable of balancing; and to be unable to crawl. (Tr. at 335.) Regarding environmental limitations, Claimant was determined to be able to tolerate occasional exposure to moving mechanical parts, operating a motor vehicle, humidity/wetness, extreme temperatures; frequent exposure to dust/odors/fumes/ pulmonary irritants, and exposure to very loud noise. (Tr. at 336.) He opined that Claimant could perform activities like shopping, traveling without a companion for assistance, ambulating without using a wheelchair, walker, canes or crutches, using standard public transportation, climbing a few steps at a reasonable pace with the use of a single hand rail, preparing a simple meal and feeding himself, caring for personal hygiene, and sorting, handling, using paper/files. (Tr. at 337.) Claimant was found unable to "walk a block at a reasonable pace on rough or uneven surfaces." Id. Dr. Beard concluded that the limitations he found

20

were first present in 2001.  Id.

On July 3, 2008, largely illegible handwritten notes from Health Plus Kanawha City Urgent Care state in part: "C/O [complaints of] back pain for years.  Got injections.  PT [physical therapy].  Nothing helped.  Had 3 MRIs, which were negative.  Gets pain pills from pain specialist but wants further evaluation. 'Just want to know what is wrong.'"  (Tr. at 347.)

On July 9, 2008, Johnny L. Leef, III, radiologist, reported on an exam of Claimant's lumbar spine upon referral from Dr. Ronen, Health Plus Kanawha City Urgent Care: "LUMBAR SPINE:  Five views were obtained.  There is normal alignment of the lumbar spine. Vertebral body heights and disc space heights are well maintained. There is no evidence for fracture or subluxation."  (Tr. at 346.)

Psychiatric Evidence

On March 14, 2007, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 250-63.)  The evaluator, Karl Hursey, Ph.D., found there was insufficient evidence to determine Claimant's impairment.  (Tr. at 250.)  Dr. Hursey stated:

> No medical to support the title 2 DLI [date last insured] claim in past.  MER [medical evidence of record] insufficient prior to DLI to evaluate mental/emotional allegations.  MER prior to DLI contains information re: physical health, but is largely empty to psych [psychiatric] info [information].  He appears to have had no c/o [complaints of] significant mental/emotional problems prior to DLI.

(Tr. at 262.)

21

On January 7, 2008, Mareda L. Reynolds, M.A., licensed psychologist, provided a psychological evaluation of Claimant for Claimant's representative. (Tr. at 301-10.) Ms. Reynolds observed that "He is basing his claim of disability on injuries sustained in a tractor accident in 2001. Mr. Lipscomb drove himself to the evaluation today. He was interviewed alone. The reliability and completeness of information he was able to provide is considered to be fair." (Tr. at 301.) She further observed:

> He is able to grocery shop, cook, do laundry, and mow the lawn with a riding tractor...In 2001, he was injured in an accident while operating a brushhog tractor. The tractor fell down a hill, landing on Mr. Lipscomb...Despite his reported medical history, Mr. Lipscomb denied any hospitalizations. He is prescribed the following medication: Kadian 100 mg qd, Lortab 10/500 mg tid PRN, Zoloft 100 mg bid, Flexeril 10 mg PRN, Benicar 40 mg qd, Vytorin 10-40 mg qd, Omeprazole 20 mg bid...Mr. Lipscomb has never received treatment from a mental health professional.

(Tr. at 303-04.)

Ms. Reynolds reached these conclusions:

> **MENTAL STATUS EXAMINATION**
> **Appearance**:...Grooming and hygiene were adequate on this occasion. **Attitude/Behavior**: Rapport was easily established and sufficient for the purpose of this assessment. He was cooperative. **Social Functioning During Assessment**: His social interaction during today's evaluation was appropriate. His eye contact was good. Length and depth of his responses were fair. He displayed a good sense of humor. **Speech**: He spoke at a normal rate and volume and in complete sentences that were easily understandable. No impairment in communication was noted. **Orientation**: He was alert and oriented. **Mood**: Objectively, mood was euthymic. **Affect**: Affect was mildly constricted, but appropriate to expressed ideas. **Thought Processes**: He denied

22

hallucinations, delusions, obsessions and compulsions. Speech was spontaneous, relevant, coherent and clear. There was no evidence of circumstantiality, flight of ideas, tangentiality, word salad, or neologism. **Insight/ Judgment**: Insight was poor. Judgment was poor, based on reported history. **Homicidal/Suicidal Ideation**: He denied homicidal or suicidal ideation at this time. **Immediate Memory**: He was able to recall four of four unrelated items immediately, indicating that immediate memory is within normal limits. **Recent Memory**: He was able to recall four of four unrelated items after thirty minutes, indicating no impairment in recent memory. **Remote Memory**: Fair, based on the quality of background information he was able to provide. **Concentration/ Attention**: The Digit Span subtest of WAIS-III was administered. Mr. Lipscomb obtained a scaled score of 9, indicating no deficit in attention and concentration. **Psychomotor Behavior**: He is ambulatory with effective use of all extremities. He is predominantly right-handed. He walked with a wide gait. Psychomotor activity was noted for a mild fine motor tremor in his hands.

**DIAGNOSTIC IMPRESSIONS**
Axis I:   311        Depressive Disorder NOS
          304.3      Cannabis Dependence
Axis II:  301.7      Antisocial Personality Disorder
Axis III: By Report:
                     Hiatal Hernia, Hemorrhoids,
                     Pain in Body, Numbness of Hands
Axis IV:  Occupational Problems
Axis V:   GAF = 45 (current)

**SUMMARY/CONCLUSIONS**
Charles Lipscomb...presented with a significant legal history and history of fighting and aggression since childhood. He reported depression beginning following an injury in 2001. He laments his loss of functioning and inability to provide for his family. He also has a reduced appetite and difficulty sleeping. He is frequently fatigued and is unmotivated to participate in activities he once enjoyed. Mr. Lipscomb often avoids social interactions and expresses a dislike for others. He feels he has been taken advantage of by companies he has worked for in the past. He reported daily use of marijuana and a history of significant alcohol use. The mental status completed today indicated a euthymic mood with mildly constricted affect. He presented with no

deficits in immediate or recent memory or concentration/
attention.  He does present with a history of poor
judgment and difficulty recalling specifics of incidents
in his past.

**PROGNOSIS**
Fair.

**CAPABILITY**
Mr. Lipscomb should be appointed a payee to manage any
financial benefits he may be awarded.

(Tr. at 305-07.)

On January 7, 2008, Ms. Reynolds also completed a form titled
"Summary Conclusions" wherein she marked that Claimant was
"Slightly Limited" in his ability to remember work-like procedures;
to understand and remember very short and simple instructions; to
understand and remember detailed instructions; to carry out very
simple instructions; to sustain an ordinary routine without special
supervision; to make simple work-related decisions; to ask simple
questions or request assistance; and to travel in unfamiliar places
or use public transportation." (Tr. at 308-09.)  She stated that
Claimant was "Moderately Limited" in his ability to carry out
detailed instructions; to maintain attention for extended periods;
to maintain regular attendance and be punctual within customary
tolerances; to complete a normal work-day and work-week without
interruption from psychologically based symptoms and to perform at
a consistent pace without an unreasonable number and length of rest
periods; to interact appropriately with the general public; to
maintain socially appropriate behavior and to adhere to basic

standards of neatness and cleanliness; to respond appropriately to changes in a routine work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of other.  Id.  She stated that Claimant was "Markedly Limited" in his ability to work in coordination or proximity to others without being unduly distracted by them; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes.  Id.  Ms. Reynolds did not find him "Not Limited" or "Extremely Limited" in any areas.  Id.  She concluded with this statement: "Substance use was not a factor in these ratings."  (Tr. at 310.)

On April 22, 2008, a State agency medical source reported a Disability Determination Examination of Claimant including a clinical interview and Mental Status Examination {"MSE"}.  (Tr. at 339-45.)  The examiner, Kay Collins-Ballina, M.A., licensed psychologist, reached these conclusions:

> MENTAL TREATMENT HISTORY: The claimant denied any previous treatment for mental health issues.  He is currently prescribed Zoloft, 200 mg by his family physician.
>
> SUBSTANCE ABUSE HISTORY: The claimant reported that he consumed six beers the previous night and smoked marijuana.  The claimant reports that he continues to use beer and marijuana.  The claimant denies any previous alcohol or drug treatment...
>
> DAILY ACTIVITIES: Typical Day: The claimant reports that his waking hour fluctuates greatly, stating he rarely sleeps, often sleeping a total of one hour through the

25

night.  The claimant reports he spends his day going to the bathroom, taking his medications, doing laundry, dishes, and mowing the law.  He does not have a regular bedtime.  <u>Activities List</u>: The claimant reports that he is able to manage his own personal hygiene needs.  The claimant reports that he does not drink any caffeinated beverages.  The claimant reports using cigarettes, smoking up to half a pack of cigarettes per day.  He also reports using snuff.

<u>MENTAL STATUS EXAMINATION</u>: <u>Appearance</u>: The claimant did not wear glasses on today's evaluation.  Dress and hygiene were appropriate.  He was neat and clean.  The claimant was dressed in a white t-shirt, jeans, and boots.  <u>Speech</u>: Speech was relative and coherent.  There was no stuttering or poor articulation notes. <u>Orientation</u>: The claimant was oriented to person, place, time and circumstance.  <u>Mood</u>: Observed mood was calm. <u>Affect</u>: Observed affect was broad.  <u>Thought Process</u>: Stream of thought was within normal limits.  <u>Thought Content</u>: Content of thought revealed no auditory or visual hallucinations.  There was no delusional thinking noted or reported.  <u>Psychomotor Behavior</u>: Psychomotor activity was within normal limits.  <u>Judgment</u>: Judgment was within normal limits, as he stated that if he found an addressed, sealed envelope on the sidewalk with a new stamp on it, he would stick it in the mailbox.  <u>Insight</u>: Insight was within normal limits, as the claimant appeared to understand the nature of his impairments and how they affect his daily activities.  <u>Immediate Memory</u>: Immediate memory was within normal limits as the claimant was able to recall four out of four words immediately after presentation without difficulty.  <u>Delayed Memory</u>: Delayed memory was mildly deficient as the claimant was unable to recall three out of four words after an approximate 15-minute delay.  <u>Remote Memory</u>: Remote memory was within normal limits as the claimant was able to recall most past events and treatments in his life without difficulty.  <u>Attention/Concentration</u>: Attention and concentration were mild deficient based on his performance on serial sevens, making two errors and with mild hesitations.

<u>DIAGNOSTIC IMPRESSION</u>:
Axis I:   V71.09    No Diagnosis
Axis II:  V71.09    No Diagnosis
Axis III:           Chronic pain (as per claimant report)

26

PROGNOSIS: Long-term prognosis for the claimant is good with treatment and intervention.

PERSISTENCE: Persistence was within normal limits as the claimant stayed on task and continued with the evaluation without difficulty.

PACE: Pace for today's evaluation was within normal limits as the claimant answered questions in a timely fashion.

SOCIAL FUNCTIONING: The claimant reports that he participates in fishing as a social activity.

CAPABILITY: If the claimant were awarded benefits, he would be capable of managing his own benefits.

(Tr. at 340-42.)

On May 8, 2008, Ms. Collins-Ballina completed a form entitled "Medical Source Statement of Ability to do Work-Related Activities (Mental)." (Tr. at 343-45.) She concluded that Claimant's ability to understand, remember, and carry out instructions; interact appropriately with supervision, co-workers, and the pubic; and his ability to respond to changes in the routine work setting were not affected by impairment. (Tr. at 343-44.) She concluded that no other capabilities were affected by the impairment. (Tr. at 344.)

Education Records

Records from Kanawha County Schools indicate Claimant graduated from high school in May 1988. (Tr. at 172.) Although a grade point average is not provided, the records show Claimant obtained a mixture of A, B, C, D, and E grades throughout his school years, and had excessive absenteeism in high school. Id.

On January 7, 2008, Mareda L. Reynolds, M.A., licensed

27

psychologist, provided a psychological evaluation of Claimant for Claimant's representative, wherein she described Claimant's education:

> Mr. Lipscomb graduated from Herbert Hoover High School in 1988. He did not receive special education services. He was not retained in any grade. He reported that he was expelled from school in Florida for fighting, but returned to West Virginia with no further problems. He described his grades as "good. I skipped a lot of school, but I passed the tests." He participated in football "for a while." He obtained a five-year certification in pipefitting from Daytona Community College.

(Tr. at 304.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not follow the "slight abnormality" standard of Social Security Ruling ["SSR"] 96-3p in finding Claimant's impairments non-severe; and (2) the ALJ failed to give Dr. Hively's opinion controlling weight under the treating sources standard of 20 C.F.R. § 404.1527(d)(2). (Pl.'s Br. at 2-7.)

The Commissioner asserts that substantial evidence in the record supports the ALJ's finding that Claimant is not disabled because (1) SSR 96-3p does not apply because the ALJ found that Claimant failed to show that he had a medically determinable impairment between September 1, 2001 and September 30, 2003; and (2) the ALJ reasonably gave no significant weight to the March 30, 2007 opinion of Dr. Hively. (Def.'s Br. at 6-12.)

28

Social Security Ruling ["SSR"] 96-3p

Claimant first argues that "[t]he ALJ failed to follow the "slight abnormality" standard in finding that the claimant's impairments are non-severe." (Pl.'s Br. at 2.) Specifically, Claimant asserts:

> Prior to his treatment with Dr. Hively, the Plaintiff was seen at Health Plus Family Health Care (Transcript pg. 185-198). The Plaintiff consistently complained of chronic low back pain since the tractor accident (which took place in 2001)(Transcript pgs. 185-198, 207-238). The Plaintiff sought treatment for low back pain, spasms, neck pain throughout the year 2003 (Transcript pgs. 185-198)...The Plaintiff sought chiropractic help in 2005, and although a couple of years post DLI [date last insured], cited the tractor incident when asked about the injury that caused his pain (Transcript pg. 203).
>
> The Plaintiff then began seeing Dr. Hively in March of 2004, only six (6) months after the expiration of the DLI (Transcript pgs. 217-219)...The Plaintiff related the back pain to the tractor accident that he had in 2001. *Id*...
>
> According to SSR 96-3p requires resolving reasonable doubts in favor of the claimant by finding "severe" impairment and continuing the evaluation process. The Regulation goes on to state, if the adjudicator is unable to determine clearly the effect of an impairment on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process until a determination can be reached (SSR 96-3p).
>
> The record documents the claimant suffered chronic back pain, hypertension, GERD, depressive disorder prior to the DLI. The ALJ erred and failed to follow the slight abnormality rule when he found the claimant's limitations to be non-severe.

(Pl.'s Br. at 2-4.)

The Commissioner responds that SSR 96-3p does not apply

because the ALJ found that Claimant failed to show that he had a medically determinable impairment between September 1, 2001 and September 30, 2003.  (Def.'s Br. at 6-9.)  Specifically, the Commissioner asserts:

> While the relevant medical evidence contained Plaintiff's symptoms (his complaints of low back pain), the objective medical signs and laboratory findings (a March 3, 2002 normal x-ray of Plaintiff's lumbar spine and negative straight-leg raising test) showed no anatomical or physiological abnormalities (Tr. 187-88).  Similarly, while Plaintiff told the state agency that he became depressed after his tractor incident in 2001 (Tr. 148), he never sought treatment from a mental health professional (Tr. 304) and all of the medical evidence regarding his alleged depression was not generated until 2005 (Tr. 24).  Thus, in accordance with the Act, the regulations, and SSR 96-4p, the ALJ reasonably found that Plaintiff failed to establish a medically determinable impairment during the relevant period (Tr. 13, Finding No. 3).
>
> In an effort to overturn this reasonable determination, Plaintiff improperly cites medical evidence outside of the relevant period (Pl.'s Br. at 3-4).  It is well-settled that it is Plaintiff's burden of proof to produce evidence of disability before his date last insured... Plaintiff's date last insured was September 30, 2003 (Tr. 13, Finding No. 1), and, by his own admission, he did not allegedly become disabled until September 1, 2001 (Tr. 114).  Thus, Plaintiff was required to prove disability between September 1, 2001 and September 30, 2003.  However, in his brief to this Court, Plaintiff cites medical evidence generated outside of this period (Pl.'s Br. at 3-4).  This is improper, and cannot serve as a basis for remanding the ALJ's reasonable decision.

(Def.'s Br. at 8-9.)

Under current law, a severe impairment is one "which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (2010); see also 20

30

C.F.R. § 404.1521(a) (2010); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2010). Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

<u>Id.</u>

SSR 96-3p provides that

> In determining the severity of an impairment(s) at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920, evidence about the functionally limiting effects of an individual's impairment(s) must be evaluated in order to assess the effect of the impairment(s) on the individual's ability to do basic work activities. The vocational factors of age, education, and work experience are not considered at this step of the process. A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities. (See SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.")

Because a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must be considered at this step of the sequential evaluation process, provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms. If the adjudicator finds that such symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the adjudicator must find that the impairment(s) is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment(s) is severe. In addition, if, after completing development and considering all of the evidence, the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process until a determination or decision about disability can be reached.

SSR 96-3p, 1996 WL 362204, *34469-70 (1996).

The purpose of SSR 96-4p is

to clarify longstanding policy of the SSA on the evaluation of symptoms in the adjudication of claims for disability benefits...In particular, this Ruling emphasizes that:

1. A "symptom" is not a "medically determinable physical or mental impairment" and no symptom by itself can establish the existence of such an impairment.

2. In the absence of a showing that there is a "medically determinable physical or mental impairment," an individual must be found not disabled at step 2 of the sequential evaluation process. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment.

3. The terms "exertional" and "nonexertional" in the regulations describe types of functional limitations or restrictions resulting from a medically determinable

physical or mental impairment; i.e., exertional
limitations affect an individual's ability to meet the
strength demands of jobs, and nonexertional limitations
or restrictions affect an individual's ability to meet
the nonstrength demands of jobs.  Therefore, a symptom in
itself is neither exertional nor nonexertional.  Rather,
it is the nature of the functional limitations or
restrictions caused by an impairment-related symptoms
that determines whether the impact of the symptom is
exertion, nonexertional, or both.

4.   The application of the medical-vocational rules in
appendix 2 of subpart P of Regulations No. 4 depends on
the nature of the limitations and restrictions imposed by
an individual's medically determinable physical or mental
impairment(s), and any related symptoms.

SSR 96-4p, 1996 WL 374187 (1996).

The ALJ found that at step one, that Claimant did not engage

in substantial gainful activity during the period from his alleged

onset date of September 1, 2001, through his date last insured of

September 30, 2003 (20 CFR 404.1571 *et seq*.).  (Tr. at 13.)

At the next step, the ALJ found:

Through the date last insured, there were no medical
signs or laboratory findings to substantiate the
existence of a medically determinable impairment (20 CFR
404.1520(c)).

The Act defines disability as the inability to do any
substantial gainful activity by reason of any medically
determinable physical or mental impairment that can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than
12 months.  An "impairment" must result from anatomical,
physiological, or psychological abnormalities that can be
shown by medically acceptable clinical and laboratory
diagnostic techniques.  Although the regulations provide
that the existence of a medically determinable physical
or mental impairment must be established by medical
evidence consisting of signs, symptoms, and laboratory
findings, the regulations further provide that under no
circumstances may the existence of impairment be

33

established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e. medical signs and laboratory findings (SSR 96-4p).

No symptoms or combination of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process (SSR 96-4p).

(Tr. at 13-14.)

The ALJ then went on to detail the medical evidence of record

and Claimant's testimony:

The claimant testified on January 24, 2008, that he has severe back pain, which radiates into his legs, arms and hands. On December 15, 2008, the claimant reported that his pain radiates into his back, neck, head and hands. The claimant was observed to have a tremor at the hearing, and he testified this was common. He has side effects from his medication, which include nausea, poor memory, drowsiness and insomnia. He sleeps only two to four hours at night. He takes Kadian and Morphine for pain. His pain and depression cause hypertension. He has had 23 different jobs, and he quit most of them. He got into conflicts with his boss. He was either fired or quit most of his jobs. He sometimes decided he was unable to perform job duties. The claimant testified that both of his doctors know that he smokes and drinks beer.

The objective evidence of record does not support the claimant's alleged symptoms. On December 28, 2000, the claimant was found to have a hiatal hernia; however, there is not evidence of further treatment or complaints (Exhibit 1F). In 2001, the claimant was evaluated for elevated hemoglobin. However, the claimant was essentially asymptomatic, and testing ruled out polycythemia vera and erythrocytosis. On June 28, 2001, the claimant was instructed to return for follow-up with

34

Dr. Cohen within six months (Exhibit 10F); however, there is no evidence the claimant returned and there is no evidence of symptoms or further treatment.

On March 3, 2002, the claimant complained of back pain after falling while ice skating. He also reported injuring his back several weeks earlier when his tractor rolled at home. He underwent an x-ray of the lumbar spine, which was negative (Exhibit 2F). An x-ray of the lumbar spine on March 31, 2004, showed only minimal changes. An MRI of the lumbar spine on April 26, 2004, was normal (Exhibit 4F). On July 9, 2008, an x-ray of the lumbar spine was normal (Exhibit 17F).

The claimant reports he has been depressed since he was injured in 2001. He reported having problems with crowds since he was in middle school. He reports a significant history of fighting and aggression towards people. His aggressive behaviors continued into adulthood, and the claimant reports a history of homicidal thoughts. He also reports a significant history of substance use and stated on consultative psychological evaluation of January 7, 2008, the claimant admitted that he continues to smoke cannabis daily. The claimant has never received treatment from a mental health professional (Exhibit 12 F). On April 22, 2008, the claimant underwent a consultative psychological evaluation and was given no diagnosis (Exhibit 16F). Accordingly, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through the date last insured.

On December 28, 2006, Uma Reddy, M.D., a State agency medical expert, reviewed the evidence of record and opined there is no evidence of a medically determinable physical impairment prior to the claimant's date last insured of September 30, 2003 (Exhibit 5F). Dr. Reddy's opinion is entitled to significant weight as it is supported by the objective evidence of record.

On March 30, 2007, Jeff Hurley [sic, Hively], M.D., the claimant's treating physician, opined the claimant can lift and carry 10 pounds occasionally and 5 pounds frequently due to pain in his low back and elbow. He opined the claimant can sit and/or walk less than two hours in an eight-hour workday and less than five minutes without interruption. He felt the claimant can sit less than four hours during an eight-hour workday and only 15

35

minutes without interruption. He felt the claimant can never climb, balance, stoop, kneel, crouch or crawl. He felt the claimant must avoid heights, temperature extremes, noise, humidity and vibration. Dr. Hurley opined the claimant can occasionally handle, finger and feel. He felt he can reach on a less-than-occasional basis. Dr. Hurley further opined the claimant's disability was present prior to September 2003 (Exhibit 13F). Dr. Hurley's opinions are entitled to little weight as they are not supported by the objective evidence of record. It appears Dr. Hurley's opinion that the claimant's disability was present prior to September 2003 is based solely on the claimant's subjective allegations.

On March 14, 2007, Marcel Lambrechts, M.D., a State agency medical expert, reviewed the evidence of record and opined there is no evidence of a medically determinable physical impairment prior to the claimant's date last insured of September 30, 2003 (Exhibit 9F). Dr. Lambrecht's opinion is entitled to significant weight as it is well-supported by the evidence of record.

On April 17, 2008, Kip Beard, M.D., the examining source, opined the claimant can lift and carry 50 pounds occasionally and 20 pounds frequently. He felt the claimant can sit four hours during an eight-hour workday, one hour without interruption. He felt the claimant can stand three hours during an eight-hour workday, one hour without interruption. He felt the claimant can walk two hours during an eight-hour workday, one hour without interruption. He felt the claimant can occasionally reach, push and pull. He felt the claimant can frequently handle, finger and feel. He felt the claimant can occasionally operate foot controls. Dr. Beard opined the claimant can occasionally climb, stoop, kneel and crouch. He felt he could never crawl. He felt the claimant can occasionally be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold, extreme heat and vibration. He felt he could frequently be exposed to respiratory irritants. He felt the claimant is unable to walk a block at a reasonable pace on rough or uneven surfaces. Dr. Beard further opined the claimant has been so limited since 2001 (Exhibit 15F). The opinions of Dr. Beard are entitled to little weight as they are not supported by the objective evidence of record. It appears Dr. Beard's opinion concerning the claimant's limitations dating back

36

> to 2001 is based solely on the claimant's subjective allegations.
>
> On March 14, 2007, Karl G. Hursey, Ph.D., a State agency medical expert, reviewed the evidence of record and opined there is no evidence of a medically determinable mental impairment prior to the claimant's date last insured of September 30, 2003 (Exhibit 8F). The opinion of Dr. Hursey is entitled to significant weight as it is well-supported by the objective evidence of record.

(Tr. at 14-16.)

SSR 96-3p only applies if Claimant established that he had a medically determinable impairment between September 1, 2001 and September 30, 2003. SSR 96-3p explains how the Commissioner is to consider allegations of pain and other symptoms in determining whether a medically determinable impairment is "severe". To be found disabled, an individual must have a medically determinable "severe" physical or mental impairment or combination of impairments that meets the duration requirement. Thus, if Claimant cannot establish a medically determinable impairment, SSR 96-3p is not applicable.

In the subject claim, the ALJ analyzed the medical evidence of record and concluded that Claimant did not meet the Social Security Act's definition because he failed to establish a medically determinable impairment between September 1, 2001 and September 30, 2003. (Tr. at 13.) To establish a medically determinable impairment, Claimant must show that he/she has "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic

37

techniques...not only by [Claimant's] statement of symptoms." 20
C.F.R. § 404.1508. Therefore, "regardless of how many symptoms an
individual alleges, or how genuine the individual's complaints may
appear to be, the existence of a medically determinable physical or
mental impairment cannot be established in the absence of objective
medical abnormalities; i.e., medical signs and laboratory
findings." SSR 96-4p, 1996 WL 374187 (1996). Where there are no
medical signs or laboratory findings to support the existence of a
medically determinable impairment, the claimant must be found not
disabled at step two of the sequential evaluation process. Id.

Thus, the court proposes that the presiding District Judge
**FIND** that the ALJ did not err in finding that Claimant failed to
establish a medically determinable impairment between September 1,
2001 and September 30, 2003. (Tr. at 13.) The medical evidence of
record showed Claimant's symptoms and complaints but failed to show
objective medical signs and laboratory findings of anatomical or
physiological abnormalities. Further, it is Claimant's burden to
produce evidence of disability prior to his date last insured. In
Johnson v. Barnhart, the Fourth Circuit held "[t]o qualify for DIB,
[Claimant] must prove that [he] became disabled prior to the
expiration of [his] insured status." 434 F.3d 650, 655-56 (4th Cir.
2005).

The undersigned notes that the Commissioner is correct in
stating that Claimant improperly cited medical evidence generated

outside of the September 30, 2003 period. (Def.'s Br. at 9; Pl.'s Br. at 3-4.) However, the court finds that even when considering Claimant's medical evidence of record gathered outside the expiration of his insured status, i.e. Claimant's care by Dr. Hively beginning in 2004, and his treatment at Elk River Chiropractic in 2005, as cited by Claimant's representative, Claimant has failed to establish disability as defined in the Social Security Act. (Pl.'s Br. at 3-4; Tr. at 199-206, 207-38.) The undersigned finds that Claimant's x-rays have been normal; no anatomical or physiological abnormalities have been found; he has sought no treatment by a mental health professional; nor has he been diagnosed with a severe physical or mental impairment by an evaluating professional during the SSA evaluation process.

Weighing Medical Opinion Evidence

Claimant next argues that the ALJ did not properly weigh the evidence of treating physician Dr. Hively under 20 C.F.R. § 404.1527(d)(2). (Pl.'s Br. at 4-7.) Specifically, Claimant asserts:

> Excluding the post-DLI state agency opinions, there is one opinion that should be credited and given weight as a treating source, i.e. Dr. Hively's opinion. Dr. Hively completed a residual functional capacity form on March 30, 2007 (Transcript pgs. 311-313). Dr. Hively noted on the RFC that he based his opinion on "positive (sic) exam findings" (Transcript pg. 312). The ALJ stated, "It appears Dr. Hively's (sic) opinion that the claimant's disability was present prior to September 2003 is based solely on the claimant's subjective allegations" (Transcript pg. 15). If the ALJ had doubts or questions of Dr. Hively's RFC, the ALJ had a duty to re-contact the

> physician or clarify the ambiguity.   20 C.F.R. §
> 404.1512(e) and 20 C.F.R. § 416.912(e) both address the
> circumstances when the evidence received from a physician
> is found to be too ambiguous upon which to base a
> disability determination...The ALJ did not give the
> treating source's opinion controlling weight, but neither
> did he apply any of the factors listed in paragraphs
> (d)(2)(I) and (d)(2)(ii) of the above listed section.
> Had the ALJ given Dr. Hively the treating source, any
> weight at all, the ALJ would have certainly found the
> Plaintiff to have severe impairments and found the
> existence of medically determinable impairments.  Had the
> ALJ given the treating source's opinion controlling
> weight to, a finding of disabled would have been in
> order.

(Pl.'s Br. at 5-7.)

The Commissioner responds that the ALJ properly weighed the

opinion evidence, and appropriately gave no significant weight to

the March 30, 2007 opinion of Dr. Hively, because it relied on

Claimant's symptoms and subjective complaints of pain and was not

supported by the objective evidence of record from the relevant

period.   (Def.'s Br. at 9-11.)  Specifically, the Commissioner

asserts:

> Notably, however, the very portion of the regulation that
> Plaintiff quotes entirely disproves his argument (Pl.'s
> Br. at 4)... Here as the ALJ explained, Dr. Hively's
> March 30, 2007 opinion deserves no significant weight
> because it relied on Plaintiff's symptoms and was not
> supported by the objective evidence of record from the
> relevant period. [The Commissioner added a footnote: "The
> Commissioner noted that the ALJ mistakenly referred to
> Dr. Hively as "Jeff Hurly, M.D."] ...
>
> Specifically, despite all of Dr. Hively's suggested
> functional limitations due to back pain (Tr. 311-13), the
> doctors that examined Plaintiff closest in time to his
> tractor incident simply diagnosed him with a pulled
> muscle and bruise in his back (Tr. 188).  Furthermore, a
> straight leg-raising test, which objectively measures low

back pain, returned negative; and an x-ray of Plaintiff's
lumbar spine revealed no abnormalities (Tr. 187-88).
Moreover, Dr. Hively himself, admitted that he had no
objective evidence from the relevant period to support
his opinion that Plaintiff was functionally limited prior
to his date last insured (Tr. 313).  Instead, he simply
guessed that this was so, stating, "[a]lso I think his
disability was present prior to September 2003" (Tr.
313)(emphasis added).     Thus, the ALJ reasonably
determined that Dr. Hively's opinion, which guessed that
Plaintiff was functionally limited prior to his date last
insured, deserved no significant weight under the
regulations.  See 20 C.F.R. § 404.1527(d)(2).

(Def.'s Br. at 9-10.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.  See 20 C.F.R. § 404.1527(d)(2) (2006).  Nevertheless,
a treating physician's opinion is afforded "controlling weight only
if two conditions are met: (1) that it is supported by clinical and
laboratory diagnostic techniques and (2) that it is not
inconsistent with other substantial evidence."  Ward v. Chater, 924
F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §
404.1527(d)(2) (2006).  The opinion of a treating physician must be
weighed against the record as a whole when determining eligibility
for benefits.  20 C.F.R. §§ 404.1527(d)(2) (2000).  Ultimately, it
is the responsibility of the Commissioner, not the court to review
the case, make findings of fact, and resolve conflicts of evidence.
Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted

41

above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527 (2006).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  <u>Id.</u> § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Section 404.1527(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4), and (5) add

42

the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The ALJ wrote a substantial decision wherein he fully considered the evidence of record, including that of treating physician Dr. Hively. (Tr. at 11-17.)  Regarding Dr. Hively's opinions, the ALJ found:

> On March 30, 2007, Jeff Hurley [sic, Hively], M.D., the claimant's treating physician, opined the claimant can lift and carry 10 pounds occasionally and 5 pounds frequently due to pain in his low back and elbow.  He opined the claimant can sit and/or walk less than two hours in an eight-hour workday and less than five minutes without interruption.  He felt the claimant can sit less than four hours during an eight-hour workday and only 15 minutes without interruption.  He felt the claimant can never climb, balance, stoop, kneel, crouch or crawl.  He felt the claimant must avoid heights, temperature extremes, noise, humidity and vibration.  Dr. Hurley opined the claimant can occasionally handle, finger and feel.  He felt he can reach on a less-than-occasional basis.  Dr. Hurley further opined the claimant's disability was present prior to September 2003 (Exhibit 13F).  Dr. Hurley's opinions are entitled to little weight as they are not supported by the objective evidence of record.  It appears Dr. Hurley's opinion that the claimant's disability was present prior to September 2003 is based solely on the claimant's subjective allegations.

(Tr. at 15.)

The undersigned has thoroughly reviewed all the records from Dr. Hively, including the March 30, 2007 residual functional

43

capacity form, and finds that the ALJ correctly concluded that Dr. Hively's opinion was entitled to little weight.  As stated earlier, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).  Here, Dr. Hively's suggested functional limitations due to back pain are not supported by the objective evidence of record.  Claimant had lumbar spine x-rays and a spine MRI on May 3, 2002, March 31, 2004, April 27, 2004, and July 9, 2008, all with "normal" results.  (Tr. at 187, 233, 236, 296, 346.)  Further, Claimant had a neck x-ray on March 31, 2004 with "normal" results, (tr. at 236), as well as a left shoulder MRI on April 27, 2004, with normal results.  (Tr. at 234.)

The ALJ stated, "It appears Dr. Hurly's (sic) opinion that the claimant's disability was present prior to September 2003 is based solely on the claimant's subjective allegations." (Tr. at 15.) Contrary to Claimant's assertion, the ALJ's use of the word "appears" does not translate to the ALJ having "doubts or questions of Dr. Hively's RFC" and causing a need to "clarify the ambiguity" as proposed by Claimant.  (Pl.'s Br. at 6.)  Clearly the ALJ was not ambiguous in his preceding sentence when he stated: "Dr. Hively's opinions are entitled to little weight as they are not

44

supported by the objective evidence of record." (Tr. at 15.) A review of Dr. Hively's March 30, 2007 assessment shows that his opinions regarding Claimant's functional limitations are based completely upon Claimant's subjective complaints of pain. (Tr. at 311-13.) A physician's "conclusory opinion based upon [Claimant's] subjective reports of pain" does not qualify as objective medical evidence. Craig v. Chater, 76 F.3d 585, 590, n.2 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1508, 404.1528; SSR 96-4.

Claimant relies heavily on Dr. Hively's handwritten notation at the end of his March 30, 2007 form which states: "Also, I think his disability was present prior to September 2003." (Tr. at 313.) Dr. Hively has provided no objective evidence to back up this opinion. (Tr. at 313.) Further, the medical evidence of record shows that he did not begin treating Claimant until March 18, 2004. (Tr. at 217.)

20 C.F.R. § 404.1527(d)(2) requires the ALJ to "give good reasons" for not affording controlling weight to a treating physician's opinion in a disability determination. The "treating source rule" requires the ALJ to give the opinion of a treating source "controlling weight" if he/she finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If a treating source opinion is not afforded

controlling weight because it does not meet these criteria, the ALJ must then determine what, if any, weight to give the opinion by examining several regulatory factors (e.g., length of the treatment relationship).  Id.

Here, the ALJ has provided "good reasons" for not giving controlling weight to Dr. Hively's statement of "I think his disability was present prior to September 2003." (Tr. at 15, 313.) The ALJ found Dr. Hively's opinion was "not supported by the objective evidence of record." (Tr. at 15.)  Dr. Hively's records show and Claimant's brief admits that Dr. Hively did not begin treating Claimant until March 2004, six months after Claimant's date last insured.  (Tr. at 217; Pl.'s Br. at 3.)

Claimant suggests that the ALJ was required to re-contact Dr. Hively.  (Pl.'s Br. at 6.) This assertion is incorrect per 20 C.F.R. §404.1512(e), which states that the ALJ is only required to re-contact a treating physician when the medical evidence received from that physician is inadequate to make a disability determination.  Here, Dr. Hively's opinion was found to be entitled to little weight because it relied on Claimant' subjective complaints of pain and was not supported by the objective evidence of record, not because it was inadequate to make a disability determination.  (Tr. at 15.)

It is Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. § 416.912(a) (2006).  Thus,

Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment.  Id. § 416.912(c).  In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel.  Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994).  Claimant bears the burden of establishing a prima facie entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

It is respectfully **RECOMMENDED** that the District Court **FIND** the ALJ properly evaluated the claim and weighed the evidence of

47

treating physician Dr. Hively under 20 C.F.R. § 404.1527(d)(2) and the applicable regulations.  Substantial evidence supports the Commissioner's decision that Claimant was not disabled as defined in the Social Security Act, at any time from September 1, 2001, the alleged onset date, through September 30, 2003, the date last insured.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a

48

waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F. 2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to transmit a copy of the same to counsel of record.

May 5, 2011
       Date

_____
Mary E. Stanley
United States Magistrate Judge